Mr. Justice Humphreys,
with whom Mr. Justice MacArthur concurred, read the following dissenting opinion:
When the land was libeled in this case, the deceased had and owned an estate in fee, incumbered by a mortgage for a small balance of a note. This estate was seized, and at the sale was sold. Had the decree been absolute, still the sale would have passed no more of a forfeiture than was passed in the case of Forrest and Bigelow, 9 Wallace. It is to be observed that the land in the case before us was an estate of the third class, as designated by the court in United States vs. Klein, 13 Wallace. It was confiscated by regular process, nothing remaining to be done to divest all right of the owner. The right and property in the land was changed by regular judicial proceeding and sentence, and by the execution of the sentence, and nothing was left that could be the subject of even a pardon.
*78 The whole or all the estate which the deceased had in and to the land was seized, and was sold as being forfeited to the Government, because the owner thereof was guilty of treason in levying war against the United States and aiding in the rebellion. The resolution saved and limited the extent of the forfeiture to be in harmony with the limitation of the second clause of section 3, article 3, of the Constitution.
When power was given in section 8, article 1, to the Congress to provide for calling forth the militia to execute the laws of the Union and suppress insurrections, subsequent provisions were made to harmonize section 4, article 4, and the other two sections cited; all work together and provide for the different contingencies to arise. And as any trial of the person for treason under article 3 would be controlled by the limitation of article 3, how was this act justified? By reason of the rebellion of the owner; by which act of treason he forfeited his property, his estate, and his life. The Government saw fit not to take life after the conflict of arms had ended. There was, it is true, no attainder of treason, but the same limitation to the forfeiture was annexed as though there had been.
If any estate was left in the deceased, the ancestor, which he could dispose of, he could dispose of it by will as much as by deed. And let us see what would have been the practical effect of this power on his part. His land was confiscated because he had joined himself to the Confederate States.
Suppose that one or more of his sons had joined the armies of the Union, and for so doing he had excluded him or them from participating in his estate. This would be giving a contradictory practical effect to an act of Congress designed to deprive the party of the power of doing injury. So a threat of disinheriting, if the son took up arms for the Union, might have deprived the Government of services which it needed. The forfeiture was complete when the sale was made, so far as any power of the offender over the estate was concerned. The fact that the estate may descend to heirs who were as hostile as their ancestors is owing to the action of the Government itself, under the Constitution, and not to that of the ancestor.
The intent and meaning of the act of July 17, 1862, may *79 be somewhat derived from recent legislation by Congress. The act of March 3, 1871, for the appointment of a board of commissioners, provides that they “shall receive, examine, and consider the justice and validity of such claims as shall be brought before them, of those citizens who remained loyal adherents to the cause and the Government of the'United States during the war, for stores or supplies taken or furnished during the rebellion for the use of the Army of the United States in States proclaimed as in insurrection against the United States, including the use or loss of vessels or boats while employed in the military service of the United States.” The claims to be allowed are strictly confined to those who prove their adherence, during the war, to the cause and the Government of the United States. The property of those obnoxious to the provisions of the act of 1862, used by the Army, is, by this act of 1871, considered as having been forfeited to the Government — and if the provisions of the act should ever be extended to embrace the whole population it may be in favor of children or heirs. But, certainly, so far as the offenders are concerned, they have no claim which would pass by assignment, or which the offender could alienate by deed or will. Now, we apprehend that it is equally as plain that the legislative power intended to make the same disposition of the property confiscated by the decree of the courts — and the act of 1871 is referred to because of recent date, and for that it relates to the subject of the use of property in the States which were in rebellion, which property was seized and appropriated .to the use of the Army of the United States. It may be instructive, in considering the extent of the act of confiscation, to refer to the case of the United States and Klein, both the opinion of the court and the dissenting reasons of Justices Miller and Bradley, although, in that case, construction was being given to the act of March 12, 1863. Incidentally, the complete divestiture of estate and ownership in property confiscated is discussed with clearness and system.
The fifth section of the act of 1862 provides for the seizure of all the estate and property, and the seventh section provides for the condemnation and sale of such property. When the property or estate of either class of offenders has been *80 seized and proof shall have been made, upon which a decree of condemnation and sale follows, then all sales, transfers, or conveyances of any such property shall be null and void, which shall have been made within sixty days after proclamation. This was the declaration of a forfeiture of estate and property. The joint resolution, which properly is a proviso to the act, limits and restrains the forfeiture of the real estate, so that it shall not extend beyond the natural life of the offender. It is not necessary to discuss the question whether this would not have been the determination of the courts even without the proviso. Mr. Lincoln thought so, and he was a clear-minded, strong, intellectual man, with a legal training and healthy cultivation of thought which enabled him to act with almost judicial calmness amid the turbulence by which his administration was surrounded. He was constitutionally called upon to act either to sign or refuse to sign the bill, before it could become an act. This consideration is strongly persuasive to show that the whole confiscation act is to be construed in the light of the principles governing the subject in the country from which we derive our ideas of jurisprudence.
The details of confiscation and forfeiture had long ago been considered in the English courts.
Blackstone, Com., 4, 381, says: “Forfeiture is twofold; of real and personal estate. First, as to real estate: by attainder in high treason a man forfeits to the King all his lands and tenements of inheritance, whether fee-simple or fee-tail, and all his rights of entry on lands or tenements, which he had at the time of the offense committed, or at any time after, ward, to b & forever vested in the Crown; and also the profits of all lands and tenements, which he had in his own right for life or years, so long as such interest shall subsist. This forfeiture relates backward to the time of the treason committed; so as to avoid all intermediate sales and incumbrances, but not those before the fact.” It is evident that the Congress, in the enactment of the law of 1862 and the joint resolution, intended to avoid any conflict with the Constitu. tion, and that it was the intent to follow out the great rules of forfeiture as understood in England, modified, limited, and controlled by our constitutional provisions.
*81 It is to be observed, however, that the act of 1862, operating upon the real property of the rebel, is, to some extent, in advance of the laws of England, and must be given force to by the general power which Congress has to prescribe the punishment of treason, or to suppress insurrection. Blackstone, Com., 4,387, says : “There is a remarkable difference or two between the forfeiture of lands and of goods and of chattels : 1, lands are forfeited upon attainder, and not before; goods and chattels are forfeited by conviction. Because in many of the cases where goods are forfeited there never is any attainder, which happens only where judgment of death or outlawry is given; therefore, in those cases the forfeiture must be upon conviction or not at all; and, being necessarily upon conviction in those, it is so ordered in all cases, for the law loves uniformity.”
But this apparent difference is explained when we consider that in England attainder works corruption of blood, and forfeiture extends to heirs. See dissenting opinion of Mr. Justice Miller in ex parte Garland, 4 Wallace, 387.
. So far as the civil powers of the Government are concerned, that must depend upon the Constitution, or some act of the Congress under the provisions of the Constitution. And the Congress has enacted the law of 1862, and the court has pronounced that act constitutional.
As we have before said, the courts saw proper to conclude that the act was an exercise of the war powers of the Government, excepting the first four sections.
Those war powers were derived from the Constitution, for among the enumerated powers is, “ the Congress shall have power to provide for calling forth the militia to execute the laws of the Union, suppress insurrections, and repel invasions.”
The act of 1862 declares that it is an act, among other objects, to suppress insurrection, to punish treason and rebellion. Each of which purposes the Congress had the express power to accomplish. One mode of doing this was to seize, condemn, and sell the lands of those engaged in rebellion.
The deceased, Charles S. Wallach, was engaged in the rebellion^ owned lands in the District of Columbia, which were seized, condemned, and sold, as provided for in said act; thereby the same became forfeited to the Government of the *82 United States, and lie, the said Charles, had no more and no longer any control over, or power to dispose of the same, or to grant them, either in fee or for life, or in any other manner.
The land was condemned for the reason that its owner was in rebellion against the Government which protected him in the peaceable possession and enjoyment thereof until, by his treason, he forfeited the right thereto. And by reason of the limitation by the act of Congress, his heirs are entitled to the possession of the same, and the property thereto is in them, subject to the satisfaction of the balance, if any, of the note secured by the deed to Carlisle.
Such are the grounds of my dissent to the judgment announced in this case.